# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**AHMAD FARID KHORRAMI,**

        Plaintiff,

    -vs-                          **Case No. 07-C-812**

**DALE MUELLER,**

        Defendant.

---

## DECISION AND ORDER

---

This matter relates to Dr. Ahmad Farid Khorrami's detention and eventual release by the Federal Bureau of Investigation in the days and months following September 11, 2001. The plight of Dr. Khorrami has already been the subject of multiple legal rulings — almost five years ago in this Court, ECF No. 33, August 29, 2008 Decision and Order Granting Motion to Dismiss; in the Seventh Circuit Court of Appeals, *Khorrami v. Rolince*, 539 F.3d 782 (7th Cir. 2008); and in the Northern District of Illinois, *Khorrami v. Rolince*, 493 F. Supp. 2d 1061 (N.D. Ill. 2007). As the Seventh Circuit noted, Dr. Khorrami's allegations "paint a sorry picture of false accusations, roughshod law enforcement, and prejudice. Yet at the same time, they remind us of how difficult it has been for law enforcement authorities to learn how to carry out their counterterrorism responsibilities in the post-9/11 world." *Khorrami*, 539 F.3d at 784.

What remains of this lawsuit is Dr. Khorrami's claim that now-retired FBI

Agent Dale Mueller pushed him to the ground and kicked him multiple times during a custodial interrogation regarding the 9/11 attacks. Months later, Dr. Khorrami suffered a heart attack which he claims was caused by post-traumatic stress disorder arising from this incident. Mueller moves for summary judgment, and also moves to exclude the opinions of Dr. Khorrami's expert cardiologist and psychiatrist. All of these motions are denied.

## I.    Background

Dr. Khorrami was born in Iran but came to the United States as a teenager for education. He received a B.S. from Purdue University majoring in Aeronautical and Astronautical Engineering. He later earned Master's degrees in Aeronautics and Applied Mathematics from the California Institute of Technology and University of California Berkeley respectively.

Dr. Khorrami moved to the United Kingdom in 1985 to earn his doctorate in Aeronautics from Oxford, after which he worked on aeronautical projects sponsored by the British Ministry of Defense. He was granted British citizenship while living in the United Kingdom. Dr. Khorrami returned to the United States in December 1997 to pursue his lifelong dream of becoming an airline pilot. At this point, Dr. Khorrami was an alien on "advance parole." "Dr. Khorrami was lawfully in the country, but only pursuant to the 'entry fiction' doctrine, which provides that 'although aliens seeking admission into the United States may physically be allowed within its border pending a determination of admissibility, such aliens are legally considered to be

- 2 -

detained at the border and hence as never having effected entry into the country.'"
August 29, 2008 Decision and Order at 8-9 (internal citations omitted).

In September of 2001, Dr. Khorrami was residing in Chicago with his wife, Julie Ashley. He was employed by Skyway Airlines in Milwaukee and was in training to be an airline pilot. Dr. Khorrami had a first class medical certificate to fly passenger airplanes. To obtain that clearance, he was required to be examined by an FAA approved doctor and to submit to regular cardiac stress tests and EKGs. FAA Guidelines for Aviation Medical Examiners specify that Examiners must disqualify any applicant with a history of coronary heart disease that has been treated or, if untreated, that has been symptomatic or clinically significant or if he has suffered a myocardial infarction. Dr. Khorrami passed cardiac stress tests in 1997 and 1999 and a 2000 EKG and received full clearance to fly airplanes each time. For example, on the 1997 stress test, Dr. Khorrami had a normal resting EKG, good exercise tolerance and no ST segment changes. The test was "negative." While the "reason for test" is cited as chest pain, Dr. Khorrami testified that he never reported chest pain and that was the administrative reason listed by the hospital when the EKG was administered so he could submit the results for his FAA license. Similarly, the 1999 stress test results showed that Dr. Khorrami's "Baseline ECG was normal . . . There were no ischemic changes noted on the stress ECG. No significant arrhythmias were noted during the stress ECG." In 2000, Khorrami's primary care physician, Dr. Jane Vogelmann, examined his EKG and found that it "remains unchanged and normal.

- 3 -

Stress test is normal. There is no reason for any concern."

After the 9/11 attacks, Dr. Khorrami heard from friends that the FBI was interested in him, so he contacted the Chicago FBI office and voluntarily submitted to an interview with Chicago FBI on September 18 at his home in Chicago. Chicago FBI advised him that they had no concerns about him. Dr. Khorrami and his wife then traveled to Skyway Airlines in Milwaukee to notify his Chief Pilot of the FBI interview. INS and FBI agents promptly arrived at Skyway Airlines and interrogated Dr. Khorrami for several hours. Dr. Khorrami was then taken to Milwaukee FBI headquarters, where a polygraph examination was conducted by FBI Agent Dale Mueller. Afterwards, Dr. Khorrami was taken by Milwaukee INS in the early hours of September 18, 2001 and incarcerated at the Waukesha County Jail.

On September 21, 2001, Mueller interviewed Dr. Khorrami at the Waukesha jail. Mueller accused Dr. Khorrami of lying to him and of being involved with Hezbollah. Khorrami denied these accusations. After the initial interrogation, Dr. Khorrami was left in isolation for an hour. He was taken to another area of the jail and placed in an office with Agent Mueller and Agent Jack Felske. Felske signed off as a witness to the lie detector tests. Felske left the room at Mueller's request.

Mueller's goal in the interrogation was to obtain a confession from Dr. Khorrami admitting his involvement in the 9/11 attacks. During the examination, Mueller repeatedly told him that the machine showed that he was lying in response to the questions. According to Dr. Khorrami, Mueller placed a blank page in front of him

- 4 -

and told him to sign his name, asking that he confess that he was involved in the terrorist attacks of September 11. In exchange, Mueller offered to provide a new identity and have the FBI tell INS not to deport him. Despite Mueller's aggressive interrogation, Dr. Khorrami denied any involvement or connection to the 9/11 attacks and refused to sign any confession. After Dr. Khorrami's refusal to sign a false confession, Mueller told him that he would inform the British Government that Dr. Khorrami was a terrorist, and they would likely send him to an Iranian dungeon, where he would never see his wife again. In response, Dr. Khorrami was crying and begging. Mueller denies asking Dr. Khorrami to sign a blank or false confession, denies threatening him for not signing a confession, and denies becoming angry with him for refusing to sign a false confession.

Dr. Khorrami testified that after he continued to deny any involvement with the 9/11 attacks, Agent Mueller pushed him from behind out of his chair to the ground. Dr. Khorrami felt a force on his back from the left and fell on his right side. Mueller quickly came over Dr. Khorrami and kicked him several times (four or five) on his upper left backside as Dr. Khorrami lay curled in the fetal position covering his face with his hands. While attacking Dr. Khorrami, Mueller swore at him. Dr. Khorrami explained that Mueller was saying "Americans don't have nickels to rub against each other, and I [Dr. Khorrami] have brought money . . . that I've come here and I deceived Americans." Dr. Khorrami cried out and begged Mueller to believe he was not involved in the attacks. The attack lasted a few minutes, less than five, after which

- 5 -

Mueller ordered Khorrami to get up and sit in the chair. Prior to releasing him back to the jail official's custody, Mueller stated that they were going to charge Dr. Khorrami with the murder of 10,000 people.

Mueller knew that Dr. Khorrami was very scared in detention. Upon seeing Dr. Khorrami on September 21, Mueller came to the conclusion that he "didn't impress me as a guy that could deal with imprisonment very well." When asked if Dr. Khorrami might have developed post-traumatic stress disorder from incarceration, Mueller commented that he "wouldn't be surprised if anything happened."

Mueller also testified that at the time of Dr. Khorrami's interrogation, the Milwaukee FBI field office was in a state of chaos. It was like "100 chickens with their heads cut off. Everyone was running around like crazy." Mueller was working very long hours and was tired. The Milwaukee FBI office had a "post-traumatic stress group counsel session at the end of every shift" and Mueller "felt some of the symptoms [the chaplain] talked about in those sessions."

The record reflects that Mueller has a history of using physical aggression and intimidation in interrogations when he became frustrated. While an FBI agent, Mueller grabbed a suspect "by his shoulders and pushed him up against the wall" because "I hated him — was angry at him — whatever words you want to use there. I was frustrated." Even though an FBI division supervisor was present during Mueller's assault, he was never reprimanded, and he was not aware of any record made of that assault. Mueller has been accused of physical intimidation in interrogations several

- 6 -

times. A court excluded a confession that Mueller had obtained in a homicide case by a court due to charges of physical intimidation. Since leaving the FBI to work private security, Mueller has had two complaints for intimidating behavior during an interview and interrogation. Mueller received counseling from his supervisors at the private security company due to these complaints.

After Mueller's assault, Dr. Khorrami called his wife and begged her to get away from him and divorce him. His wife had never heard her husband so upset; he was crying very hard. She kept asking what happened to him and he just said over and over again, "Just divorce me. Get away. Divorce me."

Dr. Khorrami had blood in his urine for several days after Mueller's assault. He experienced chest pains after the assault and during his incarceration. He suffered from pain on his back where Mueller had repeatedly kicked him. Due to the location of the injury on his back, Dr. Khorrami could not see whether there was any visible bruising or other marks.

Mueller's assault exacted a devastating psychological toll on Dr. Khorrami. Due to the attack, he feared for his life and from future assaults. During and after his incarceration, Dr. Khorrami repeatedly had nightmares involving Mueller's assault. He fixated on the attack.

Due to further concerns for his safety, Dr. Khorrami did not complain to prison guards or medical officials about FBI Agent Mueller's assault because he feared for his life from further assault or retribution. Additionally, getting medical attention at

- 7 -

Waukesha County Jail was difficult, and after being beaten and tortured, Khorrami was more concerned with being charged as a participant in 9/11 than seeking treatment for the pain in his back and blood in his urine. He only received attention for an ear infection which he testified was "unbearable" and just to receive any treatment for that earache, he "practically had to beg them for a day or two." Khorrami testified that he did not report Mueller's physical abuse to the psychologist or chaplain at Waukesha because when he began to tell him what happened, the man told him that he "did not want to hear it."

Khorrami was transferred to DuPage County Jail on September 24, 2001 and eventually released from custody on December 14, 2001. His personality and physical appearance was very different upon his release. His wife observed that he was "much thinner, his hair was grayer. His skin was a funny color to me. He was very withdrawn, very quiet, didn't really engage initially with conversations or friends."

Within three to four weeks of his release, Dr. Khorrami told his wife that he was assaulted by Mueller in prison. He explained that Mueller became "very angry with him during the questioning" and kicked him. Ms. Ashley became very upset and said "Why didn't you tell me?" Dr. Khorrami responded that he "didn't want to upset" her and he "knew this would happen" because she was "immediately crying and felt shocked that this had happened, angry hurt, hurt for my husband." Dr. Khorrami told his wife that he urinated blood for many days after the assault.

- 8 -

In January 2002, Dr. Khorrami told Dr. Vogelmann about the attack. Dr. Vogelmann wrote down Dr. Khorrami's exact words in her medical records, that he reported being "kicked in the back" and experienced blood in his urine for several days afterwards. He asked her if the blood would be from being kicked in the kidneys. Dr. Vogelmann marked this in her notes with an arrow to "hematuria 4 sev. Days, now OK." Dr. Vogelmann described her observations of Dr. Khorrami's devastated emotional state as follows: "He came in to see me, and he looked awful. I was shocked at his appearance. He was very fragile, very traumatized, kind of, um, distressed. He looked nothing like what he looked like prior to the time I saw him. He was like a shell of his former self. He was almost trembling when he described what happened to him." Dr. Vogelmann thought that Dr. Khorrami needed a psychiatric evaluation because he was "traumatized" and "shell-shocked."

On February 18, 2002, Dr. Khorrami suffered a myocardial infarction and was admitted to the Coronary Care Unit at Northwestern Memorial Hospital. Dr. Dan Fintel was the cardiologist assigned to Dr. Khorrami's care. Khorrami reported his incarceration and physical abuse to Dr. Fintel and emergency room doctors while in the hospital. Dr. Fintel recommended psychological counseling.

## II. Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

Mueller argues that Dr. Khorrami failed to create an issue of fact as to whether he was actually assaulted. This is simply incorrect. Khorrami's testimony is more than sufficient to create a genuine issue of fact that can only be resolved at trial. Moreover, Dr. Khorrami's version of events is corroborated by the testimony of his wife and his doctors. Summary judgment "cannot be used to resolve swearing contests between litigants." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Mueller also argues that Dr. Khorrami failed to raise an issue of fact regarding causation. This argument refers to Mueller's motions to exclude the testimony of Dr. Khorrami's psychiatrist regarding post-traumatic stress disorder and Dr. Khorrami's cardiologist regarding his heart attack. For the reasons stated below, these motions are denied. Moreover, there are other aspects to Dr. Khorrami's damages, including past and future lost wages and physical and emotional suffering. As before, Dr.

- 10 -

Khorrami's own testimony is more than sufficient to create a genuine issue for trial as to whether Mueller's assault caused these damages.

Finally, Mueller argues that he is entitled to qualified immunity because Dr. Khorrami's right to be free from physical abuse was not clearly established in 2001. The Court previously noted that Khorrami's status as an excludable alien on advance parole "gives rise to the inference that he did not enjoy the full panoply of constitutional rights." August 29, 2008 Decision and Order at 14. However, the Court also acknowledged, with respect to substantive due process, that excludable aliens have the right to be free from "gross physical abuse." *Id.* at 18 (citing *Gisbert v. United States*, 988 F.2d 1437, 1442 (5th Cir. 1993)). The "entry fiction" that "excludable aliens are to be treated as if detained at the border despite their physical presence in the United States determines the aliens' rights with regard to immigration and deportation proceedings. It does not limit the right of excludable aliens detained within United States territory to humane treatment." *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987). Claims relating to "prolonged incarceration under harsh conditions" do not meet this standard*, see Adras v. Nelson*, 917 F.2d 1552, 1559 (11th Cir. 1990), but the "malicious infliction of cruel treatment" does. *Lynch* at 1374, 1376 (excludable aliens who were drugged, punched, beaten, maced, and sprayed with a high-pressure fire hose stated actionable claims). Therefore, Dr. Khorrami's right not to be viciously and maliciously beaten was clearly established at the time of the alleged assault. *Id.* at 1375 ("It does not require a court ruling for a state official

- 11 -

to know that even an excludable alien may not be denied the fundamental liberty interest to be free of gross physical abuse in the absence of some articulable, rational public interest that may be advanced by such conduct").

Mueller cites a Ninth Circuit case which reversed the denial of qualified immunity because it was not clearly established in 2001 that the mistreatment alleged in that case amounted to torture. *Padilla v. Yoo*, 678 F.3d 748, 750 (9th Cir. 2012). This case is distinguishable because it involves the mistreatment of an enemy combatant, not an excludable alien. It is also distinguishable because it involves the legal standards for torture, not gross physical abuse. *Id.* at 768 ("although we hold that the unconstitutionality of torturing an American citizen was beyond debate in 2001-03, it was not clearly established at that time that the treatment Padilla alleges he was subjected to amounted to torture"). Dr. Khorrami does not allege that he was tortured; even if he did, the government cannot torture excludable aliens. *See, e.g., Rosales-Garcia v. Holland*, 238 F.3d 704, 721 (6th Cir. 2001) ("It is also evident that Congress cannot authorize the infliction of physical torture upon an excludable alien while he is detained in federal prison") (citing *Gisbert* and *Lynch*) (vacated and remanded for reconsideration on other grounds); *Lynch* at 1375 ("If the argument advanced by the harbor police defendants were sound, the Constitution would not have protected the stowaways from torture or summary execution. To state the proposition is to assure its rejection").

Mueller's motion for summary judgment is denied.

- 12 -

## III.    Expert testimony

Rule 702 of the Federal Rules of Evidence requires the Court to perform a "gatekeeping" function before admitting expert scientific testimony in order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The Court must make the following inquiries: first, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case. *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013). With regard to reliability, the Court considers a non-exhaustive list of guideposts, including whether the scientific theory can be or has been tested, whether the theory has been subjected to peer review and publication, and whether the theory has been generally accepted in the relevant scientific, technical, or professional community. *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010) (citing *Daubert* at 593-94). A *Daubert* inquiry "is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination,

- 13 -

presentation of contrary evidence, and careful instruction on the burden of proof.'"

*Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (quoting *Daubert* at 596).

### A. Dr. Scheftner

Mueller's cardiology expert, Dr. Jeffrey Brinker, opined that the victim of a physical assault or traumatic event does not re-experience psychological trauma to the same degree as the original event. ECF No. 88, January 6, 2011 Decision and Order. Dr. Khorrami elicited the expert testimony of Dr. William A. Scheftner to rebut this opinion.

Dr. Scheftner is a board certified psychiatrist with a medical degree from the University of Wisconsin Medical School. He is the former Chairman and an associate professor of the Department of Psychiatry at Rush University Medical Center in Chicago and an attending psychiatrist at Rush-Presbyterian, St. Luke's Medical Center, with a private practice. The Court finds that Dr. Scheftner is qualified to render the following opinions, although as discussed more fully below, Mueller argues that Dr. Scheftner is not qualified to render opinions four and five:

> 1. Dr. Khorrami began to display the symptoms of post-traumatic stress disorder (PTSD) on or about 9/22/01 and the full syndrome was present at the time of discharge from the DuPage County Jail on December 14, 2001.
>
> 2. Dr. Khorrami continues to have symptoms and signs of PTSD to the present.
>
> 3. As a result of PTSD, Dr. Khorrami re-experienced significant psychological trauma primarily from being kicked by Mr. Mueller but also from other aspects of his detention and treatment to a

- 14 -

substantial if not the same degree for a period beginning September 21, 2001 until he was placed on medication for the myocardial infarct he experienced on February 17, 2002.

    4.    The presence of PTSD increases ongoing secretion of adrenalin consistent with advancing the conditions for coronary heart disease.

    5.    The presence of PTSD symptoms increases the probability of fatal and non-fatal cardiovascular events.  Thus, the greater the number of severity of the symptoms of PTSD, the greater the probability of symptomatic coronary heart disease.

Scheftner Report, ECF No. 132-53, Ex. 103, at 2.

Mueller criticizes Dr. Scheftner's PTSD diagnosis because he failed to conduct psychometric testing or rule out malingering.  *See* ECF No. 132-55, Ex. 105, DSM IV, V65.2 ("The essential feature of Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . obtaining financial compensation . . .").  Dr. Scheftner conducted extensive interviews of Dr. Khorrami and his wife.  He also reviewed the medical records and depositions of Dr. Vogelman and Dr. Fintel, as well as the expert report and deposition of Dr. Brinker.  He then synthesized all of this information and compared it to the DSM-IV criteria to make a diagnosis.  In the course of his analysis, Dr. Scheftner probed for consistency in an effort to rule out malingering.  There is nothing inherently unreliable about this methodology.  "Diagnoses based on personal observations and medical training is certainly admissible. . . . The fact that . . . opinions were rendered from conversations . . . and . . . prior records, instead of an

- 15 -

'accepted test' goes to weight, not admissibility . . ." *Trafton v. Sunbury Primary Care, P.A.*, 689 F. Supp. 2d 198, 204 (D. Me. 2010).

Mueller also argues that Dr. Scheftner's diagnosis would be unhelpful to the jury because he fails to distinguish the psychological effects of the "kicking" incident from other alleged stressors, such as the detention itself. There is no need to make this artificial distinction. While Dr. Khorrami's only remaining legal claim is for the alleged kicking, the damages that arise out of that incident cannot be taken in isolation from the fact that he was in custody as a wrongfully-accused 9/11 participant. In essence, Mueller's argument conflates causation and foreseeability. *See, e.g., Powers v. Hamilton Cnty. Public Defender Com'n*, 501 F.3d 592, 608-09 (6th Cir. 2007) ("Cause in fact is typically assessed using the 'but for' test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than it did. . . . [P]roximate cause [is] a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct"). Dr. Scheftner explained as follows:

> The actual event of being thrown from his chair and kicked in the back is the most significant and stressful among many during his incarceration. It is reflected in his dreams, his preoccupation with his 88 day experience and was the event which proved to him his life was in danger, he had no protection from the law and that he might be deported to a 'dungeon.' This assault occurred despite having no connection whatsoever to the terrorists or the events of 9/11. *Without it, it is doubtful he would have developed post-traumatic stress disorder*.

Scheftner Report at 5 (emphasis added). Therefore, Dr. Scheftner's testimony will

- 16 -

assist the jury in determining whether Mueller's assault was a substantial factor in Dr. Khorrami's development of PTSD. *Hibma v. Odegaard*, 769 F.2d 1147, 1155 (7th Cir. 1985) ("To be the legal cause of harm to another, a tortfeasor's conduct must constitute a substantial factor in bringing about the harm"). It will also assist the trier of fact on the issue of proximate cause.

Next, Mueller argues that Dr. Scheftner is not qualified render expert opinions on cardiology (as he did in opinions four and five) because he is not a cardiologist. Mueller cites *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010), which stated the general proposition that "simply because a doctor has a medical degree does not make him qualified to opine on all medical subjects," but the very same opinion went on to explain that "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats. . . . The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Id.* (internal citations omitted). Aside from his specialized training in psychiatry, Dr. Scheftner also has education and experience in general medical practice. He is easily qualified to testify regarding the intersection between psychiatry, brain function, and basic cardiovascular principles. His opinions on these subjects do not require specialized knowledge in the field of cardiology. *Id.* at 618.

More specifically, Mueller argues that Dr. Scheftner's fourth opinion is unreliable because the only source linking the secretion of adrenalin with advancing

- 17 -

the conditions for coronary heart disease is the opinion of Dr. Fintel. As explained below, Dr. Fintel's opinion is admissible; an expert's use of another expert's reliable testimony obviously doesn't run afoul of *Daubert* or Rule 702. *Gayton* at 618 ("To the extent that this amounts to 'adopting the cause of death' finding of another expert, we see no problem with it").

Finally, Mueller argues that Dr. Scheftner's opinion that the presence of PTSD symptoms increases the probability of fatal and non-fatal cardiovascular events should be excluded because it relies on studies of subjects without pre-existing coronary artery disease. However, these studies are relevant because most people, including the subjects of the study, would have some underlying but undiagnosed levels of coronary disease, just like Dr. Khorrami at the time of his first heart attack.

For all of the foregoing reasons, Dr. Scheftner's opinions are admissible under *Daubert* and Rule 702.

### B.     Dr. Fintel

Dr. Fintel is a board certified cardiologist with a subspecialty in cardiovascular disease, nuclear cardiology, and critical care medicine. He attended Harvard Medical School where he graduated magna cum laude and received the Harold Lamport Biomedical Research Prize. Dr. Fintel completed his residency at Mount Sinai Hospital in New York, New York and his fellowship at the Johns Hopkins Medical Institutions in Baltimore, Maryland. Dr. Fintel is currently director of the Coronary Care Unit and an attending physician at Northwestern Memorial Hospital in Chicago,

- 18 -

Illinois.  Dr. Fintel also serves as a professor of medicine at the Northwestern University Feinberg School of Medicine.  He has been an investigator in eleven research grants and continuously publishes studies and research.  Dr. Fintel is obviously qualified to offer an opinion on the cause of Dr. Khorrami's heart attack.

Dr. Fintel opines that Mueller's assault and the resulting psychological trauma accelerated Dr. Khorrami's underlying, but not yet clinically apparent, coronary artery disease resulting in his myocardial infarction in February 2012.  After Dr. Khorrami's release, he continued to experience stress and emotional trauma because he continued to relive Mueller's assault.  The continued stress caused high levels of adrenaline which caused Dr. Khorrami's heart attack when a plaque rupture completely blocked a blood vessel in his heart resulting in his myocardial infarction.  Expert Report of Dr. Fintel, ECF No. 132-47, Ex. 97 at 3.

As with Dr. Scheftner, Mueller criticizes Dr. Fintel for failing to isolate the kicking incident from the various other stressors in relation to that incident.  For the reasons already stated, this is not a valid basis to attack the reliability of Dr. Fintel's opinion.  Mueller also argues that Dr. Fintel failed to account for other risk factors, including family and medical history.  To the contrary, Dr. Fintel explains that these factors made him "susceptible to other stressors and risk factors that can cause infarctions," but they did not "predetermine that he would suffer from coronary artery disease or an asymptomatic infarction."  Ex. 97 at 3; *see also* ECF No. 131-1, Ex. 1, Fintel Dep. at 157 ("if [Dr. Khorrami] did not have the underlying substrate of early

- 19 -

coronary disease . . . he would not have had the heart attack"). Put another way, Dr. Khorrami was certainly at risk for a cardiac event, but the attack and resulting PTSD was the triggering event.

Mueller further criticizes Dr. Fintel for his inability to identify medical literature or studies that he relied upon in forming his opinions. As an initial matter, Dr. Fintel identified "core cardiovascular texts" regarding the relationship between extremely stressful events and heightened risk of cardiac events. Moreover, other doctors who have been deposed in relation to this case concur with the general proposition that stress can play a part in the genesis of a heart attack. This less-than-earth-shattering theory is accepted by cardiologists and general practitioners alike. Mueller argues that Dr. Khorrami could not have re-experienced the trauma of the assault with the same impact and severity as the original assault, but again, this theory is bolstered by other expert testimony in this case, including the opinion of Dr. Scheftner, discussed above. *See also* ECF No. 132-56, Ex. 106, Expert Report of Dr. Stevan E. Hobfoll, at 10 ("intrusive 're-experiencing'" is "consistent with PTSD for such individuals"); ECF No. 132-57, Ex. 107, Hobfoll Dep. at 118 ("when you're re-experiencing, you're getting the shock again and again").

Finally, Mueller relies on *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316 (7th Cir. 1996), which upheld the exclusion of a cardiologist's opinion that a heart attack was caused by wearing a nicotine patch for three days. This opinion lacked "scientific rigor" because the expert failed to explain how a nicotine overdose can "precipitate a

- 20 -

heart attack." *Id.* at 319. Here, Dr. Fintel explained in great detail how stress can precipitate a heart attack:

> Heart attacks are due to a confluence of risk attacks and a trigger. So heart attacks generally occur in predisposed individuals, and by 'predisposed,' I mean individuals who have risk factors like family history, high blood pressure, high cholesterol, smoking, diabetes, sedentary lifestyle. . . . It's thought that every heart attack the patient has, they have literally small plaque rupture events prior to that heart attack at that and other cites of the coronary tree, but it is a trigger that may be severe enough, as in the case of emotional stress or reliving a horrific event, that may lead to an accumulation of adrenaline in the bloodstream that changes the properties of coagulation, blood pressure, and the constriction of the blood vessel that leads to an acute plaque rupture severe enough to cause a clinical event, and I believe exactly the latter happened with Dr. Khorrami.

Fintel Dep. at 46-47. This and other explanations in the record demonstrate that Dr. Fintel's opinion "has been subjected to the scientific method, ruling out any subjective belief or unsupported speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002). It is therefore admissible evidence at trial.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.     Mueller's motion for summary judgment [ECF No. 128] is **DENIED**;

2.     Mueller's motion to exclude the expert testimony of Dr. Scheftner [ECF No. 129] is **DENIED**; and

3.     Mueller's motion to exclude the expert testimony of Dr. Fintel [ECF No. 130] is **DENIED**; and

- 21 -

4.    The Court will conduct a telephonic status conference on **September 4, 2013** at **10:00 a.m. (CST)**, the purpose of which is to schedule this case for trial on the Court's calendar.

Dated at Milwaukee, Wisconsin, this 12th day of August, 2013.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**